UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DANIELA VELJKOVIC, | ) | |
| | ) | |
| Plaintiff, | ) | 20 C 1551 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| BOARD OF EDUCATION OF THE CITY OF | ) | |
| CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Daniela Veljkovic claims that her former employer, the Chicago Board of Education, discriminated against her because she is white and retaliated against her for opposing race and sex discrimination, in violation of Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, *id.* § 2000e *et seq.*, and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* Doc. 1. The Board moves to dismiss under Civil Rule 12(b)(6). Doc. 22. The motion is granted, though Veljkovic will be given an opportunity to replead.

### Background

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Veljkovic's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Veljkovic as those

materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

The Board employed Veljkovic as a teacher from 1995 until she resigned on January 8, 2019. Doc. 1 at ¶¶ 9, 39. From 2013 through her resignation, she taught art at Consuella York Alternative High School, which is the high school for juveniles detained at the Cook County Jail. *Id.* at ¶¶ 7, 9. Veljkovic is white. *Id.* at ¶ 1.

The principal of York, Sharnette Sims, who is Black, discouraged teachers from reporting student disciplinary infractions. *Id.* at ¶¶ 10-12. This practice gave a false impression of the safety conditions at York and thereby endangered faculty and students. *Id.* at ¶¶ 11-12. In Fall 2016, the Board's Office of the Inspector General ("OIG") launched an investigation into allegations that Sims had engaged in this and other misconduct. *Id.* at ¶ 13. Veljkovic agreed to be interviewed by the OIG and truthfully conveyed "her knowledge of practices and incidents at York." *Id.* at ¶¶ 13-14.

On September 12, 2017, the OIG issued its report, a copy of which is attached to the complaint. *Id.* at ¶ 15; Doc. 1-1. The OIG report described "extensive improper practices" at York, Doc. 1-1 at 2, including inaccurate enrollment and attendance reporting, improper practices for issuing credits, deficient course structures, and inflated performance scores, *id.* at 4-7. The report stated that "many teachers" had complained that Sims "discouraged them from reporting dangerous incidents at the school," including "chronic classroom masturbation" and "threatening conduct by an organized faction of students who committed sexual assaults in the jail." *Id.* at 7. The OIG report did not attribute any complaints to any specific teacher, and the complaint does not allege that Veljkovic made any particular statement to the OIG. The OIG

report recommended that Sims be removed from her position as principal. Doc. 1 at ¶ 17; Doc. 1-1 at 7.

The Board temporarily removed Sims as principal, though she continued to perform administrative duties. Doc. 1 at ¶¶ 18-19. The Board then undertook its own investigation of the matter, led by Deputy General Counsel James Ciesil. *Id*. at ¶¶ 21-22. Veljkovic agreed to be interviewed by Ciesil and confirmed the allegations and complaints that she and her colleagues had made to the OIG. *Id*. at ¶ 22. Ciesil issued a report on November 2, 2017, a copy of which is attached to the complaint. *Id*. at ¶ 24; Doc. 1-2. Although the Ciesil report was labeled "Attorney-Client Privileged Work Product," Doc. 1-2 at 2, 8, the Board released an unredacted version to the news media, Doc. 1 at ¶¶ 24-27.

The Ciesil report broadly rejected the OIG's findings. It noted that the OIG report was largely based on interviews of eleven current and former York teachers, nine of whom had previously been disciplined by Sims. Doc. 1-2 at 5, 27. The Ciesil report also noted that the OIG had interviewed only two Black teachers, even though 70 percent of York's teaching staff is Black. *Id*. at 5, 26-27, 29. In part based on those figures, the Ciesil report concluded that there had been "a racial element to the OIG's investigation" and that "race play[ed] a part in the OIG investigation." *Id*. at 5, 16 n.21. The Ciesil report ultimately found that the OIG report "contain[ed] serious errors, omissions and an exaggeration of key factual conclusions," *id*. at 5, and determined that there was insufficient evidence to warrant discipline against Sims, *id*. at 48. The report identified the name and race of the eleven teachers that the OIG interviewed, including Veljkovic's. *Id*. at 27-29.

After the Ciesil report was released, Chicago Public Schools CEO Forrest Claypool issued a statement thanking Sims and apologizing for the "blight on her reputation" caused by

the OIG report. Doc. 1 at ¶ 32. A person referred to in Veljkovic's complaint as the "Network Chief" recommended that everyone read the Ciesil report because it vindicated Sims. *Id*. at ¶ 31. The Board reinstated Sims to her position as principal of York. *Id*. at ¶ 33.

After Sims's reinstatement, she stoked anger against Veljkovic among Veljkovic's colleagues at York. *Id*. at ¶ 36. Veljkovic was moved from division to division within York and excluded from important communications and invitations, and some colleagues no longer worked cooperatively with her. *Id*. at ¶ 37. Veljkovic fell ill with a condition exacerbated by the treatment she experienced, and she resigned her employment on January 8, 2019. *Id*. at ¶ 39.

## Discussion

Veljkovic claims that she was subjected to the above-described mistreatment because she is white, in violation of Titles VI and VII. *Id*. at ¶¶ 41-46, 66-71. She also claims that the Board retaliated against her for opposing race discrimination through her participation in the OIG and Ciesil investigations, in violation of Titles VI and VII. *Id*. at ¶¶ 47-57, 72-82. Finally, she claims that the Board retaliated against her for opposing sex discrimination through her participation in the OIG and Ciesil investigations, in violation of Title IX. *Id*. at ¶¶ 58-65. The Board moves to dismiss all her claims. Doc. 22.

## I.      Title VI Claims

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The Board argues that Veljkovic's Title VI claims should be dismissed because Title VI does not extend to its employment relationship with her. Doc. 22 at 5-6. The Board is correct, for two distinct but related reasons.

First, by its express terms, Title VI may not be construed "to authorize action … by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization *except where a primary objective of the Federal financial assistance is to provide employment*." 42 U.S.C. § 2000d-3 (emphasis added). Congress enacted § 2000d-3 out of "concern that the receipt of any form of financial assistance might render an employer subject to the commands of Title VI rather than Title VII." *Johnson v. Transp. Agency*, 480 U.S. 616, 627 n.6 (1987). In *Ahern v. Board of Education of Chicago*, 133 F.3d 975 (7th Cir. 1998), the Seventh Circuit interpreted § 2000d-3 to limit employment discrimination claims under Title VI to cases in which "(1) providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid." *Id*. at 978 (quoting *Trageser v. Libbie Rehab. Ctr., Inc.*, 590 F.2d 87, 89 (4th Cir. 1978)); *see Doe ex rel. Doe v. St. Joseph's Hosp. of Fort Wayne*, 788 F.2d 411, 419 n.12 (7th Cir. 1986) ("Although section 2000d-3 expressly addresses only agency action, courts have uniformly held that, even in private actions under Title VI, the primary objective of the federal grant must be to provide employment."), *overruled on other grounds by Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487 (7th Cir. 1996).

Veljkovic's allegations meet neither prong of the *Ahern* test. As to the first, it is true that the Board receives federal education funds under Title I of the Elementary and Secondary Education Act, 20 U.S.C. § 6301 *et seq*. Doc. 1-2 at 15 (indicating that the Board allocates Title I funds to York). But the statutorily defined purpose of Title I is "to provide all children significant opportunity to receive a fair, equitable, and high-quality education, and to close educational achievement gaps." 20 U.S.C. § 6301. Because the "primary objective" of Title I aid is to educate students, and because employing teachers is only a means to that end,

Veljkovic's claims fail to satisfy the first *Ahern* prong.  In fact, the Department of Education, which administers Title I, has promulgated regulations enumerating the statutes that, in its considered view, have employment as a primary objective, and Title I is not among them.  *See* 34 C.F.R. § 100.3(c)(1); *id*. pt. 100, app. A.

As to the second *Ahern* prong, race discrimination in teacher employment can sometimes cause discrimination against students, the primary beneficiaries of Title I funds.  *See Ahern*, 133 F.3d at 977 (explaining that a 1977 desegregation plan for Chicago public schools included faculty hiring provisions because "the Title VI ban against discrimination in federal programs might be violated by certain patterns of faculty and staff assignments"); *Afogho ex rel. A.A. v. Ill. Cent. Sch. Dist. 104 Bd. of Educ.*, 421 F. Supp. 3d 585, 593-94 (S.D. Ill. 2019) (holding that the complaint sufficiently alleged that race discrimination against Black basketball coaches denied students "meaningful, nondiscriminatory participation in school activities"); 34 C.F.R. § 100.3(c)(3) (providing that Title VI applies to employment practices "to the extent necessary to assure equality of opportunity to, and nondiscriminatory treatment of, beneficiaries").  Veljkovic's allegations do not match this theory, however, because they do not raise a plausible inference that discrimination against her caused discrimination against York students.

Veljkovic does allege the racial composition of York students, 77 percent Black and 3 percent white.  Doc. 1 at ¶ 8.  Yet her only other factual allegations about York students—that Sims turned a blind eye student misconduct, *id*. at ¶¶ 11-12, 15-16—concern harms inflicted *by* students, not *upon* them.  Veljkovic attempts to bring her suit within the scope of the second *Ahern* prong by alleging in conclusory fashion that the Board's actions "prejudiced and acted to the detriment of the students of York."  *Id*. at ¶ 43(j).  But that is a legal assertion the court need not accept as true on a Rule 12(b)(6) motion.  *See Zahn*, 815 F.3d at 1087.

In sum, because Veljkovic does not allege a nexus between race discrimination against her and the educational experience of York students, § 2000d-3 bars her Title VI claims.

The second reason that Veljkovic cannot proceed under Title VI is that her claims do not fall within the zone of interests that the statute protects. The Seventh Circuit has held that "in order to bring a private action under Title VI 'the plaintiff must be the intended beneficiary of, an applicant for, or a participant in a federally funded program.'" *Doe*, 788 F.2d at 418-19 (quoting *Simpson v. Reynolds Metal Co.*, 629 F.2d 1226, 1235 (7th Cir. 1980)). Some district court decisions understand *Doe*'s holding to address whether plaintiffs have "standing" to assert Title VI claims, and the parties here adopt that terminology. Doc. 22 at 5; Doc. 25 at 4; *see Shebley v. United Cont'l Holdings, Inc.*, 357 F. Supp. 3d 684, 694 (N.D. Ill. 2019); *Doe v. Woodridge Elementary Sch. Dist. No. 68 Bd. of Educ.*, 2005 WL 910732, at *2 (N.D. Ill. Apr. 13, 2005); *Methodist Hosps., Inc. v. Ind. Fam. & Soc. Servs. Admin.*, 860 F. Supp. 1309, 1336 (N.D. Ind. 1994). The Supreme Court, however, has moved away from using "standing" terminology to describe the reach of statutory causes of action. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) ("'[P]rudential standing' is a misnomer as applied to the zone-of-interests analysis, which asks whether this particular class of persons ha[s] a right to sue under this substantive statute.") (citation omitted); *Friends of Trumbull v. Chi. Bd. of Educ.*, 123 F. Supp. 3d 990, 995 (N.D. Ill. 2015) ("Settled law has long distinguished between Article III standing and the statutory zone of interests.") (citing *Lexmark*, 572 U.S. at 125-28). The holding of *Doe* concerned the zone of interests that Title VI protects, not standing in the Article III sense of the term.

Terminology aside, the pertinent question here is whether Title VI grants Veljkovic a right to sue as either "the intended beneficiary of" or "a participant in" the Board's educational

programming. *Doe*, 788 F.2d at 418. Veljkovic does not meet either criterion. The Illinois statute establishing the Board announces that "the primary purpose of schooling is the transmission of knowledge and culture through which children learn in areas necessary to their continuing development." 105 ILCS 5/34-1.01. The intended beneficiaries of the Board's programming are therefore schoolchildren, and the Board hires teachers to serve those beneficiaries. *See Woodridge Elementary*, 2005 WL 910732, at \*2 (holding that parents were not intended beneficiaries of the public schools); *Miller v. Phelan*, 845 F. Supp. 1201, 1207 (N.D. Ill. 1993) (holding that an applicant to the board of a municipal transportation authority had no Title VI claim because "the most likely beneficiaries of the [transportation authority] are the riders"). Likewise, the participants in the Board's educational programming are students, not teachers.

Veljkovic thus fails to state a claim under Title VI, both because § 2000d-3 bars her claims and because she does not fall within the statutory zone of interests. *See Doe*, 788 F.2d at 419 n.12 (holding that the court's application of the zone-of-interests rule was "consistent with 42 U.S.C. § 2000d-3, which in effect is a specific application of the intended beneficiary rule to employment practices"). Veljkovic's Title VI claims are dismissed.

## II. Title VII Race Discrimination Claim

Title VII's antidiscrimination provision makes it "unlawful … for an employer … to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "[A] complaint alleging [race] discrimination need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of [her race]." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 633 (7th Cir. 2013)

(alterations in original). The Board argues that the complaint fails to allege that it took an adverse employment action against Veljkovic. Doc. 22 at 6, 15. The Board is correct.

The Seventh Circuit has identified three categories of adverse employment actions:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1069 (7th Cir. 2012). "To rise to the level of an adverse action, a change must be one that a reasonable employee would find to be materially adverse." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 889 (7th Cir. 2016) (internal quotation marks omitted). "This means that the action must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012).

The complaint alleges that Veljkovic "was subjected to disparagement" when the Ciesil report "besmirched [her] reputation" by stating that she had "performance issues" and was "racially motivated." Doc. 1 at ¶¶ 10, 27-28, 67(e)-(f). Relatedly, the complaint alleges that Sims "stoked anger against" Veljkovic, causing her colleagues to exclude her from important communications and to stop working cooperatively with her. *Id.* at ¶¶ 36-37. These allegations sound in the register of a race-based hostile work environment claim, which fits within the third category of adverse employment actions. *See Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 745 (7th Cir. 2002) (holding that the third category includes "cases of harassment—mistreatment of an employee by coworkers or supervisors that is sufficiently severe to worsen substantially his

conditions of employment as they would be perceived by a reasonable person in the position of the employee") (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 786-88 (1998)). The trouble for Veljkovic is that the mistreatment she describes does not allege a viable hostile work environment claim.

As for the Ciesil report, Veljkovic's allegations that the report accused her of incompetence and racism cannot be reconciled with the report itself. The Ciesil report expressly stated that Veljkovic had *not* received negative performance reviews: it observed that most OIG interviewees had "been disciplined or been denied a promotion" by Sims, but pointed out that Veljkovic was "[t]he one exception" to this trend. Doc. 1-2 at 29; Doc. 22-1 at 2 (a less redacted version of Doc. 1-2 at 29). The Ciesil report never stated that Veljkovic spoke to the OIG due to any racial prejudice against Sims. The Ciesil report could be read to say that *the OIG* had racist motives: it noted multiple times that the OIG chose to interview mostly white teachers at a school where most teachers are Black. Doc. 1-2 at 5, 16 n.21, 26-27, 29. But the Ciesil report nowhere insinuated that any *teacher* who spoke to the OIG did so out of racial animus. Veljkovic's indisputably incorrect characterizations of the Ciesil report, Doc. 1 at ¶¶ 27, 67(e)-(f), are disregarded because the report, having been attached to the complaint, takes precedence on a Rule 12(b)(6) motion. *See Phillips*, 714 F.3d at 1020 ("To the extent that an exhibit attached to or referenced by the complaint contradicts the complaint's allegations, the exhibit takes precedence.").

Veljkovic's allegations concerning aloof and uncooperative colleagues, Doc. 1 at ¶ 37, are insufficient to plead a hostile work environment. To rise to the level of a hostile work environment, a workplace must be "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment

and create an abusive working environment." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). Veljkovic's allegations regarding how her colleagues treated her do not even begin to approach that standard. *See Shultz v. Congregation Shearith Isr. of N.Y.*, 867 F.3d 298, 309 (2d Cir. 2017) (affirming the dismissal of a hostile work environment claim because "none of [the alleged incidents] taken in isolation is sufficiently severe, and all of them taken together … are not sufficiently pervasive, to raise an issue of fact as to whether [the plaintiff] suffered a hostile work environment").

Veljkovic also alleges that she was subjected to a constructive discharge—another potential adverse employment action—in that she resigned in January 2019 after she became "critically ill with a condition exacerbated by the discrimination, harassment, and retaliation." Doc. 1 at ¶¶ 39, 68. "A constructive discharge can result from a hostile work environment only if the environment is 'even more egregious than that needed for a hostile work environment.'" *Ulrey v. Reichhart*, 941 F.3d 255, 262 (7th Cir. 2019) (quoting *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 401 (7th Cir. 2010)). Because Veljkovic fails to allege a hostile work environment, it necessarily follows that she fails to allege a constructive discharge.

Veljkovic alleges as well that she was "moved from division to division within York." Doc. 1 at ¶¶ 37, 67(i). As noted, a "nominally lateral transfer" can be an adverse employment action if it "reduces the employee's career prospects by preventing her from using her skills and experience." *Dass*, 675 F.3d at 1069. But "a purely lateral job transfer does not normally give rise to Title VII liability … because it does not constitute a materially adverse employment action." *EEOC v. AutoZone, Inc.*, 860 F.3d 564, 569 (7th Cir. 2017); *see also Herrnreiter*, 315 F.3d at 744 ("[A] purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance … cannot rise to the level of a materially adverse employment action. A

11

transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either."). Veljkovic alleges no facts about her division-to-division transfers—such as what the different divisions were or whether she was prevented from using her skills—that would raise a plausible inference that they were "demotions in substance." The transfers therefore do not qualify as adverse employment actions.

Finally, the complaint alleges that Veljkovic was subjected to "unwarranted discipline" and "unfair performance evaluations." Doc. 1 at ¶ 10. But Veljkovic does not mention the unfair discipline and evaluations in her brief opposing dismissal, Doc. 25 at 7-11, so any argument based on them is forfeited. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court. That is true whether it is an affirmative argument in support of a motion to dismiss or an argument establishing that dismissal is inappropriate.") (citations omitted). In any case, the Seventh Circuit has consistently held that "[u]nfair reprimands or negative performance reviews, unaccompanied by tangible job consequences," are not adverse employment actions. *Boss v. Castro*, 816 F.3d 910, 919 (7th Cir. 2016); *see also Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010) ("[U]nfair reprimands or negative performance evaluations, unaccompanied by some *tangible* job consequence, do not constitute adverse employment actions."); *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009) ("[W]ritten reprimands without any changes in the terms or conditions of [the plaintiff's] employment are not adverse employment actions."). As noted, Veljkovic does not allege that she suffered any tangible job consequences.

Because the complaint fails to allege that the Board took an adverse employment action against Veljkovic, her Title VII race discrimination claim is dismissed.

### III. Title VII Retaliation Claim

Title VII's antiretaliation provision "prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing 42 U.S.C. § 2000e-3(a)). "To [plead] a *prima facie* case of retaliation under Title VII, [Veljkovic] must [allege that]: (1) [s]he engaged in a statutorily protected activity, (2) [her] employer took a materially adverse action against [her], and (3) there is a causal link between the protected activity and the adverse action." *Mollet v. City of Greenfield*, 926 F.3d 894, 896 (7th Cir. 2019).

Before proceeding, it bears mention that Veljkovic's failure to allege an adverse employment action for purposes of her Title VII *discrimination* claim does not necessarily defeat her Title VII *retaliation* claim. In the retaliation context, "'[m]aterially adverse actions' are those that might dissuade a reasonable employee from engaging in protected activity," and "th[at] category sweeps more broadly than the 'adverse employment actions' required to sustain a discrimination claim." *Benuzzi v. Bd. of Educ. of Chi.*, 647 F.3d 652, 665 (7th Cir. 2011) (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006); then citing *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173-74 (2011)); *see also Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 568 (7th Cir. 2004) ("In this circuit, we construe adverse action taken in retaliation quite broadly."). So, it is possible for an action to qualify as a materially adverse action for purposes of a retaliation claim, yet not rise to the level of an adverse employment action for purposes of a discrimination claim.

It is unnecessary to decide whether Veljkovic has alleged a materially adverse action, however, because she does not allege any "statutorily protected activity," the first element of her retaliation claim. *Mollet*, 926 F.3d at 896. "Statutorily-protected activity requires more than

simply a complaint about some situation at work, no matter how valid the complaint might be." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 718 (7th Cir. 2018) (internal quotation marks omitted). To allege protected activity, the employee's complaint about a situation at work "must indicate [that] discrimination occurred because of sex, race, national origin, or some other protected class." *Ibid.* (alteration in original) (internal quotation marks omitted). That is, the plaintiff must allege "that she opposed conduct prohibited by Title VII, or at a minimum that she had a 'reasonable belief' she was challenging such conduct." *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997).

Veljkovic argues in her brief that her interview with the OIG was protected activity under Title VII because the OIG investigation concerned violations of school district policies that adversely affected Black and Latino students at York. Doc. 25 at 11. But Title VII protects those who oppose "unlawful employment practice[s]," not those who oppose adverse impacts on individuals whom an employer serves. 42 U.S.C. § 2000e-3(a). Moreover, Veljkovic does not allege that she complained to the OIG about any racially disparate impact of Sims's actions. In fact, the complaint contains no information whatsoever about what Veljkovic told the OIG—it alleges only that she was interviewed. Doc. 1 at ¶¶ 14, 73. The OIG report lends no further plausibility to Veljkovic's argument because it also does not mention any racially disparate impact on York students. Doc. 1-1. In short, nothing indicates or even suggests that Veljkovic mentioned race discrimination in her OIG interview. It follows that her statements during that interview do not qualify as statutorily protected activity. *See Hatcher v. Bd. of Trs. of S. Ill. Univ.*, 829 F.3d 531, 537 (7th Cir. 2016) (affirming dismissal of a Title VII retaliation claim because "there is no suggestion in the complaint that … [the plaintiff] was opposing unlawful

14

*employment* discrimination, and therefore engaging in a statutorily protected activity"), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016).

Next, Veljkovic argues in her brief that her interview with Ciesil was protected activity because the Ciesil report found that the OIG harbored racial animus against Sims. Doc. 25 at 11. Again, the complaint does not allege anything about what Veljkovic told Ciesil. Doc. 1 at ¶¶ 22, 73. In fact, the complaint's allegations exclude the possibility that Veljkovic complained to Ciesil about the OIG's racial animus against Sims. Specifically, the complaint alleges that Veljkovic "confirmed the allegations" about Sims when she spoke to Ciesil, *id.* at ¶ 22, and it further alleges that the OIG correctly accused Sims of misconduct and that Sims was given preferential treatment because she is Black, *id.* at ¶¶ 11-12, 15, 20, 29-30, 34-35. These allegations fatally undermine Veljkovic's argument in her brief that she complained to Ciesil about race discrimination *against* Sims.

Because Veljkovic fails to allege that she engaged in any statutorily protected activity, her Title VII retaliation claim is dismissed. *See EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 781 (7th Cir. 2007) ("[A] plaintiff … alleging illegal retaliation on account of protected conduct must provide some specific description of that conduct beyond the mere fact that it is protected.").

## IV.    Title IX Retaliation Claim

Title IX "prohibits discrimination on the basis of gender by educational institutions receiving federal financial assistance." *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 917 (7th Cir. 2012). In addition, Title IX prohibits "retaliat[ion] against a person because [she] complains of sex discrimination." *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 388 (7th Cir. 2012) (emphasis omitted) (internal quotation marks omitted). The Board seeks dismissal of

15

Veljkovic's Title IX retaliation claim on the ground that Title VII provides the sole avenue for retaliation claims in the employment context. Doc. 22 at 14-15.

In *Waid v. Merrill Area Public Schools*, 91 F.3d 857 (7th Cir. 1996), *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009), the Seventh Circuit held that "Title VII provides a comprehensive statutory scheme for protecting rights against discrimination in employment." *Id*. at 861-62. Some district court decisions read *Waid* to hold that, in the employment context, Title VII precludes under Title IX not only sex *discrimination* claims, but also sex-based *retaliation* claims. *See*, *e.g.*, *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 2020 WL 6434979, at *11 (S.D. Ind. Oct. 21, 2020) ("Because retaliation is a form of discrimination, [the plaintiff's] Title IX claim is preempted."). Other decisions hold that *Waid* addresses only discrimination claims and that retaliation claims may proceed under both Title VII and Title IX. *See*, *e.g.*, *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 171 F. Supp. 3d 830, 840 (W.D. Wis. 2016) (distinguishing between "allegations of direct sex discrimination" and "retaliation for conduct that Title IX protects"), *aff'd*, 851 F.3d 690, 695 (7th Cir. 2017) (not addressing whether retaliation claims can proceed under Title IX in the employment context).

There is no need to choose sides here because Veljkovic fails to allege that she engaged in activity protected by Title IX. As noted, Title IX prohibits "retaliat[ion] against a person because [she] complains of sex discrimination." *Milligan*, 686 F.3d at 388 (emphasis omitted) (internal quotation marks omitted). Yet Veljkovic does not allege that she complained of sex discrimination either to the OIG or to Ciesil. The OIG report did state that some interviewed teachers complained about sexual harassment by York students. Doc. 1-1 at 6. But Veljkovic does not allege that she was one of those teachers; she alleges only that she "truthfully reported

to the OIG regarding her knowledge of practices and incidents at York." Doc. 1 at ¶ 14. The Ciesil report stated that just one interviewee felt unsafe at York and named that teacher, who was not Veljkovic. Doc. 1-2 at 46. Nothing indicates that Veljkovic mentioned sexual harassment or other sex discrimination in her interviews with the OIG and Ciesil. She therefore fails to state a Title IX retaliation claim. *See Concentra Health*, 496 F.3d at 781 (holding that a plaintiff alleging retaliation under Title VII "must provide some specific description" of the protected activity); *Burton*, 851 F.3d at 695 (holding that Title VII and Title IX retaliation claims have the same elements).

## Conclusion

The Board's motion to dismiss is granted. The dismissal is without prejudice to Veljkovic filing an amended complaint. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) ("Ordinarily, … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed."). Veljkovic has until January 14, 2021 to file an amended complaint. If she does not do so, the dismissal will convert automatically to a dismissal with prejudice, and judgment will be entered. If Veljkovic amends her complaint, the Board will have until February 4, 2021 to file a responsive pleading.

December 22, 2020
_____

United States District Judge